UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

HUGH J. PINSON,

       Plaintiff,

       v.                                    Case No. 12-C-0395

CAROLYN W. COLVIN,[1]

       Defendant.

### DECISION AND ORDER REVERSING DECISION OF THE COMMISSIONER AND REMANDING CASE

Hugh J. Pinson appeals from the Social Security Administration's denial of his application for Supplemental Security Income disability insurance benefits (DIB) and Supplemental Security Income (SSI). In claims filed August 19, 2008, Pinson alleged disability beginning June 1, 2004. Pinson's claims for benefits were denied initially and upon reconsideration. Thereafter, an Administrative Law Judge (ALJ) conducted a hearing on December 10, 2010, at which Pinson was represented by counsel. Pinson and a vocational expert (VE) testified at the hearing. On December 22, 2010, the ALJ denied benefits, finding Pinson not disabled. On February 28, 2012, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.

Pinson filed this appeal on April 30, 2012, again represented by counsel. He asserts that the ALJ committed errors of law and that the decision was not supported by substantial evidence.

---

[1]On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security, replacing Michael J. Astrue. Social Security Fact Sheet, http://www.ssa.gov/pressoffice/factsheets/colvin.htm (last visited Mar. 18, 2013). Accordingly, the caption has been amended.

Under 42 U.S.C. § 405(g), "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." On review, the court will overturn the Commissioner's final decision only if it lacks support by substantial evidence, is grounded in legal error, or is too poorly articulated to permit meaningful review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 699 (7th Cir. 2009). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000). The court views the record as a whole but does not reweigh the evidence or substitute its judgment for that of the ALJ. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). The ALJ is not required to address every piece of evidence or testimony presented, but must provide a "logical bridge" between the evidence and his or her conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Evidence favoring as well as disfavoring the claimant must be examined by the ALJ, and the ALJ's decision should reflect that examination. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). However, the court's review is confined to the rationale provided in the ALJ's decision. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943)).

To obtain DIB and SSI, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505.

The Social Security Administration has adopted a sequential five-step process for determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920. The ALJ

2

determines at step one whether the claimant is currently engaged in substantial gainful activity. If not, at step two the ALJ determines whether the claimant has a severe physical or mental impairment. If so, at step three the ALJ determines whether the claimant's impairments meet or equal one of the impairments listed in the Administration's regulations, 20 C.F.R. pt. 404, subpt. P, app. 1 (the "listings"), as being so severe as to preclude substantial gainful activity. If so, the claimant is found disabled. If not, at step four the ALJ determines the claimant's residual functional capacity (RFC) and whether the claimant can perform his past relevant work. If he can perform his past relevant work then he is not disabled. However, if he cannot perform past work, then at step five the ALJ determines whether the claimant has the RFC, in conjunction with age, education, and work experience, to adjust to other work. If the claimant can adjust, he is found not disabled. If he cannot adjust, he is found disabled. 20 C.F.R. 404.1520; *see Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

RFC is the most the claimant can do in a work setting despite his limitations. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p; *Young*, 362 F.3d at 1000-01. It reflects an individual's ability to do sustained work-related physical and mental activities on a regular and continuing basis, meaning eight hours per day five days a week or an equivalent schedule. SSR 96-8p. The Administration must consider all of the claimant's known, medically determinable impairments when assessing RFC. § 404.1545(a)(2), (e). The burden of moving forward at the first four steps is on the claimant. At step five, the burden shifts to the Commissioner to demonstrate that the claimant can successfully perform a significant number of other jobs that exist in the national economy. *See Young*, 362 F.3d at 1000.

In the present case, the ALJ determined that Pinson passed steps one and two: Pinson had not engaged in substantial gainful activity since June 1, 2004, and severe impairments resulting from hypertensive cardiovascular disease, cocaine abuse, hepatitis C, and chronic kidney disease. The ALJ found that although the evidence referenced gout and back pain, those conditions were not severe impairments. (Tr. at 57.) At step three, the ALJ determined that Pinson's impairments, alone or in combination, did not meet or medically equal any of the listings. (*Id.*)

Before turning to step four, the ALJ found that Pinson had the RFC

> to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except he is limited to work involving only simple, routine and repetitive tasks in a low stress job (defined as having only occasional changes in the work setting); and involving only occasional interaction with the public and supervisors.

(Tr. at 58.) Light work is defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) as involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and "a good deal of walking or standing, or . . . sitting most of the time with some pushing and pulling of arm or leg controls." To be considered able to do a full range of light work, a claimant must be able to do substantially all of these activities. *Id.*

The ALJ found that Pinson passed step four, indicating that the demands of Pinson's past relevant work exceeded his RFC. Then, the ALJ decided at step five that Pinson was not disabled because there are jobs that exist in significant numbers in the national economy that Pinson is able to perform. (Tr. at 60.)

4

ANALYSIS

A.   Cocaine Abuse

The first argument is that the ALJ improperly dealt with Pinson's cocaine abuse by failing to comply with 20 C.F.R. § 404.1535. That section provides that *if the Commissioner finds a claimant disabled* but medical evidence of drug addiction or alcoholism exists, the agency "must determine whether [the claimant's] drug addiction or alcoholism is a contributing factor material to the determination of disability." § 404.1535(a).[2] To determine whether the addiction is a contributing factor, the agency evaluates whether the claimant's physical and mental limitations would remain if the claimant stopped using drugs or alcohol and, if so, whether the remaining limitations would be disabling. § 404.1535(b).

By its terms, regulation § 404.1535 applies only when the agency first finds a claimant disabled. In other words, if the ALJ finds claimant *not* disabled, no determination about whether substance abuse was a material factor needs to be made. *Accord Jones v. Colvin*, No. 09 C 7645, 2013 WL 1407779, at *16 (N.D. Ill. Apr. 8, 2013); *Fuller v. Astrue*, No. 12 C 0171, 2013 WL 617073, at *4 n.8 (N.D. Ill. Feb. 19, 2013); *Richardson v. Astrue*, No. 11 C 7080, 2013 WL 427125, at *8 (N.D. Ill. Jan. 31, 2013). Here, the ALJ found Pinson not disabled. Therefore § 404.1535 officially never came into play and the ALJ's failure to apply the regulation was not by itself error.

However, Pinson's brief raises a concern in addition to simply whether § 404.1535 should be applied. Regulation 404.1535 highlights the need for two separate inquiries.

---

[2] A person who is otherwise disabled cannot receive SSI or DIB if drug addiction or alcoholism is a "contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C).

5

Initially, the ALJ must determine whether the claimant is disabled under the five-step analysis. Only then does the ALJ consider whether and how drug abuse plays a role in the disability. *See Rutherford v. Astrue*, No. 10 C 8016, 2013 WL 500842, at *7 (N.D. Ill. Feb. 11, 2013); *Richardson*, 2013 WL 427125, at *8 ("An ALJ must address this issue by first evaluating an applicant's disability claim irrespective of substance abuse. If the claimant is not disabled under this analysis, the inquiry ends. If the claimant is found to be disabled, the ALJ evaluates which of a claimant's current limitations would remain if he stopped using alcohol or drugs."). However, in the present case the ALJ muddled the two inquiries. Throughout the ALJ's decision he blends references to Pinson's cocaine abuse. For instance, the ALJ remarked that at a consultative examination (*see* Tr. at 437-39 (Exhibit B9F)), "[t]he claimant's history of cocaine abuse was noted as likely the main reason for his cardiac problems, and he continued such use." (Tr. at 59.) Also, the ALJ found that "[t]he evidence shows the claimant's problems with hypertension and heart failure appear to be due to cocaine abuse and medical/medication noncompliance." (Tr. at 60.) He then forecasted that Pinson "would do . . . better yet if, as he states, he has stopped his 20 year cocaine habit of daily use." (Tr. at 60.) These comments suggest that the ALJ improperly considered in his *initial* determination regarding disability that Pinson's high blood pressure and cardiac condition were caused by his cocaine abuse. Instead of determining overall disability and only then analyzing whether cocaine addiction was a contributing factor, the ALJ merged the two stages of consideration, requiring reversal. On remand, the ALJ should determine at step five whether Pinson is disabled, without any consideration of his

6

cocaine abuse. Only then, if Pinson is determined to be disabled, should the ALJ consider the cocaine abuse.[3]

Moreover, whether Pinson's high blood pressure and cardiac problems were *caused* by drug use is not determinative of disability. *See Pettit v. Apfel*, 218 F.3d 901, 904 (8th Cir. 2000) ("[E]ven if long-term alcohol abuse causes a disability, alcoholism will not be found 'material' to the finding of disability if the disability remains after the claimant stops drinking."); *Richardson*, 2013 WL 427125, at *8 ("[C]ourts have also found that an addiction may not be 'material' under the regulations even if it causes a claimant's disability."). It is unclear from the ALJ's decision how his thoughts or remarks about causation affected the disability determination. On remand, the ALJ should refrain from considering whether Pinson's conditions were caused by his drug abuse when determining whether he is disabled..

Finally, the court notes that the ALJ's comment that "[t]he evidence shows the claimant's problems with hypertension and heart failure appear to be due to cocaine abuse and medical/medication noncompliance" (Tr. at 60) is contradicted by evidence that the ALJ did not discuss. The record includes statements of treating physicians that hypertension is the likely cause of Pinson's congestive heart failure; cocaine use (while it was occurring—Pinson testified that he stopped using in July 2009) *exacerbated* the congestive heart failure. (Tr. at 286, 311, 344, 404-05.) Though the ALJ referenced a statement from a consultative examiner that Pinson's history of cocaine abuse "may be the main reason of his cardiac problems" (Tr. at 439 (Ex. B9F)), the ALJ did not discuss this

---

[3]In this case, as Pinson says he *did* stop using drugs in July 2009, medical evidence subsequent to July 2009 gives the ALJ evidence on which to base such a decision.

7

contradictory evidence that hypertension, not cocaine abuse, caused the CHF. For example, treating cardiologist Dr. Allaqaband determined that one of Pinson's hospitalizations was related to his "noncompliance, highly elevated blood pressure causing acute decompensated heart failure." (Tr. at 311.) The ALJ failed to discuss this contrary evidence in the record and explain why he found that the statements regarding causation by cocaine abuse were more reliable than those regarding causation by high blood pressure. While an ALJ need not discuss every piece of evidence, he may not ignore evidence contrary to his ruling; otherwise the reviewing court cannot tell whether the decision rests upon substantial evidence. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003).

B.   Treating Physcan

Generally, the Administration gives more weight to the medical opinion of a source who examined the claimant than the opinion of a source who did not. 20 C.F.R. § 404.1527(d)(1). Further, because of the unique perspective of and longitudinal picture from a treating physician, his or her opinion is given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *accord* SSR 96-2p; *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). "Controlling weight" means that the opinion is adopted. SSR 96-2p. A treating physician's opinion may have several points; some may be given controlling weight while others may not. *Id.* When evidence in opposition to the presumption is introduced, the rule disappears and the treating physician's opinion is just one piece of evidence the ALJ must consider. *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006).

8

An ALJ's finding that a treating physician's opinion is not entitled to controlling weight "does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator." SSR 96-2p. In determining the weight to give a non-controlling treating physician's opinion, the ALJ must consider the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the physician's evidence supporting the opinion, the consistency of the opinion with the record as a whole, the specialty of the physician, and any other relevant factors. 20 C.F.R. § 404.1527(d)(2)-(6).

The ALJ must always give good reasons for the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. The ALJ must give reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. An ALJ can reject a treating physician's opinion only for reasons supported by substantial evidence in the record. *Gudgel*, 345 F.3d at 470. In this regard, the Seventh Circuit approved an ALJ's decision to not give the treating physician's opinion controlling weight where the doctor did not have requisite specialty, familiarity with the patient, or longitudinal relationship with the patient. *See White v. Barnhart*, 415 F.3d 654, 658-59 (7th Cir. 2005); *Daniels v. Colvin*, No. 1:12-cv-00316-SEB-MJD, 2013 WL 3776515, at *6 (S.D. Ind. July 16, 2013).

Pinson's treating physician, Dr. Scerpella, opined on March 24, 2010, in an application for Pinson to receive housing, that Pinson was disabled under a definition of a person with a physical, mental or emotional impairment that (1) is expected to be of long, continued and indefinite duration; (2) substantially impedes his ability to live independently;

9

and (3) is of such a nature that the person's ability could be improved with more suitable housing conditions. (Tr. at 488.) On a residual functional capacity form completed on July 20, 2010, Dr. Scerpella stated that Pinson suffered chronic pain, chronic fatigue, and somnolence and that the symptoms were severed enough to interfere with attention and concentration for simple work tasks. (Tr. at 510.) When asked to report on Pinson's ability to stand, walk, or sit during a workday and his restrictions for lifting or for hand use, Dr. Scerpella declined to provide specifics and wrote: "Given current condition not able to perform any activity or maintain attention." (Tr. at 511.) On a functional capacity questionnaire completed on September 29, 2010, Dr. Scerpella stated that Pinson was limited to sedentary work. In response to questions about Pinson's ability to stand, walk, sit, bend, squat, climb, reach, and use his hands, the doctor wrote: "None[—]cannot do." (Tr. at 588.) Although Dr. Scerpella's handwriting is difficult to decipher, he appears to have written: "Has consequences from chronic illness which have an impact on stamina, attention, strength. Is really not a viable candidate to return to work force." (Tr. at 589.)

The ALJ discussed Dr. Scerpella's medical opinion and evidence as follows:

> As for the opinion evidence, Dr. Scerpella opined the claimant was disabled and his poor memory made him a good candidate for case management devices from Guest House of Milwaukee (Exhibits B17F and B20F). However, the reliability of Dr. Scerpella's opinions is undermined by his failing to note the effects of the claimant's cocaine use, his long term history of such use, and by the claimant's functional ability as shown by his activities of daily living and, in the past, by his ability to work at the level of substantial gainful activity even while using cocaine between 2000 and 2003. The undersigned, accordingly, gives limited weight to such opinions.

(Tr. at 60.)

This assessment of Dr. Scerpella's opinions requires reversal. First, as discussed above, Dr. Scerpella opined on more than whether Pinson was a good candidate for

10

housing services. In addition, the ALJ says he gave "limited weight" to Dr. Scerpella's opinions, but this court cannot determine from the ALJ's written decision exactly *how much* weight "limited weight" is and whether some of Dr. Scerpella's opinions were accorded more weight than others. Also, this court does not see the correspondence between Dr. Scerpella's failure to make notes regarding Pinson's past drug usage and Dr. Scerpella's assessment of Pinson's condition. If Pinson's testimony regarding quitting drug use is accepted, at the time Dr. Scerpella provided these opinions Pinson had been drug free for eight to fourteen months. Regardless of what caused Pinson's conditions and whether cocaine exacerbated conditions before mid-2009, Dr. Scerpella was treating conditions as exhibited in 2010. Nor does Pinson's ability to work from 2000 to 2003 while using cocaine contradict an opinion of disability and poor memory years later.

Importantly, the ALJ impliedly rejected Dr. Scerpella's opinions as controlling but neglected to discuss the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the physician's evidence supporting his opinions, or the specialty of the physician as required by 20 C.F.R. § 404.1527(d). Nor did the ALJ discuss other medical evidence that supported Dr. Scerpella's opinions. For instance, the same consulting examiner (Dr. Hafeez) referenced by the ALJ for the finding that cocaine use caused Pinson's congestive heart failure found that Pinson's ejection fraction[4] of thirty to thirty-five percent would give him dyspnea[5] on exertion and fatigue and

---

[4] The term "ejection fraction" means the portion of the blood contained in the heart's ventricle that is expelled during contraction, normally fifty-five percent or greater but decreasing with the onset of congestive heart failure. Stedman's Medical Dictionary 769 (28th ed. 2006).

[5] The term "dyspnea" means shortness of breath or difficulty or distress in breathing, usually associated with heart or lung disease. Steadman's Medical Dictionary 601 (28th ed. 2006).

11

shortness of breath very easily, even if Pinson was taking his medications. (Tr. at 439.) Although the ALJ noted this comment by Dr. Hafeez (Tr. at 59), he did not discuss it in relation to Dr. Scerpella's opinions. Where an ALJ's decision leaves the reviewing court with reservations as to whether an issue was fully addressed, the court should reverse. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Such is the case here.

C. Credibility

In determining the credibility of a claimant's statements, an ALJ must consider the entire case record. SSR 96-7p. This includes the objective medical evidence, the individual's statements about symptoms, statements provided by treating or examining physicians, and any other relevant evidence. *Id.* "[S]ymptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone." *Id.* Additionally, when assessing credibility, the ALJ must consider the individual's daily activities; the location, duration, frequency, and intensity of pain; factors that precipitate or aggravate the symptoms; the type, dosage, effectiveness, and side effects of medication taken; treatment other than medication that the person has received for relief of pain; any measures other than treatment the person has used to relieve pain; and any other pertinent factors. *Id.* Once the ALJ makes a credibility finding, the impact of the symptoms on the individual's ability to function are considered along with the objective medical and other evidence. *Id.*

Pinson's testimony at the hearing included discussion of his past work as a sales representative, the hours he worked, the physical requirements of his job, and how much he was paid. (Tr. at 23-25.) In response to the ALJ's questions, Pinson indicated that a

12

job in 2006 or 2008 ended when he was fired, though the employer did not tell him clearly why he was fired. (Tr. at 23-24.)

Next, Pinson testified that he had gone through drug or alcohol rehabilitation counseling within the two years prior to the hearing. (Tr. at 27.) He stated he had last used drugs (cocaine) on July 3, 2009, and alcohol on December 18, 2009. (Tr. at 27-28.) His cocaine use began in the 1970s and became regular in the late 1980s, continuing daily until 2009. (Tr. at 39-40.) However, Pinson quit on his own without inpatient treatment. (Tr. at 40.)

Pinson testified that he lived alone in an apartment building, cooked for himself, did his own cleaning, used public transportation without assistance, handled his own money, shopped for groceries, read and studied the Bible, and watched some television. (Tr. at 28-29.) He stated that he did not walk much, but instead rode a bus when he left the house. Pinson went to church every week and attended a Bible study every Wednesday. (Tr. at 29.)

In response to his attorney's questions, Pinson stated that his heart problems affected him on a daily basis regarding breathing and fatigue. When asked what made him short of breath he responded: "Just movement. Like, like around the apartment, I usually, whether I go to the bathroom, or whether I go to the kitchen, or whatever, just movement . . . ." (Tr. at 31.) He experienced shortness of breath every day. (Tr. 37-38.)

Pinson stated that he could fall asleep when sitting and that he "just get[s] tired easy." (Tr. at 31.) He experienced interrupted sleep at night because he needed to use the bathroom often. (Tr. at 31-32.) Pinson added that his "nerves are steadily off the scale" and had been so since his father died in 1969, though the condition worsened when

13

he started using drugs. (Tr. at 33-34.) Furthermore, Pinson stated that his hand shook, sometimes to the point that his handwriting was not legible, though doctors had not recommended any treatment for it. (Tr. at 34.)

Pinson indicated that he was taking medication for gout and that he experiences attacks "[e]very now and then." (Tr. at 35.) His last attack was a week before the hearing. During the attack Pinson experienced pain in and could barely move his big toe. (Tr. at 35.) He stated that he suffered from gout flare ups about once a month, mostly in his feet. (Tr. at 36.) Pinson noted that his Hepatitis C caused him to "itch all the time" in his genital area. (Tr. at 36-37.) On a bad day he can hardly stand on his feet and cannot reach his feet for grooming. (Tr. at 37.)

When asked about medications, Pinson initially said he had taken his medication regularly since August 2008, then revised the statement to admit not taking high blood pressure medication regularly because he was unable to get the medication or unable to pay for it. (Tr. at 32-33.)

Pinson explained that when doing daily activities he does each for a "couple minutes." (Tr. at 38.) As an example, he will

> wash dishes for a couple minutes, let them soak for a little bit. Then go back in there, wash them. The only thing that takes a little longer is the laundry, and I will drag the bag of clothes downstairs in the basement to wash them. And once they're done, well, then drag them back up [two flights of stairs.]

(Tr. at 38.) Pinson said he did not fill the laundry bag fully, as he would have problems dragging it, and he does not pick the bag up. (Tr. at 38.) He feels exhausted when he gets to the top of the stairs and must sit and rest. (Tr. at 38-39.)

14

In the section of the ALJ's opinion setting forth the RFC finding, it states that he had considered all of Pinson's "symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and 416.929 and SSRs 96-4p and 96-7p." (Tr. at 58.) Thereafter, he assessed Pinson's credibility as follows:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. at 59.)

With one exception ("could" instead of "would"), this language is identical to that rejected in *Bjornson v. Astrue*, 671 F.3d 640, 644-46 (7th Cir. 2012). The Seventh Circuit criticized this language for its suggestion that the ALJ worked backwards from determining RFC to determining credibility, which is impermissible. *Id.* at 645. Unless other discussion by the ALJ indicates that credibility was assessed properly, use of the *Bjornson* language suggests that the case should be remanded.

No other discussion by the ALJ overcomes the problems with the *Bjornson* language. According to the ALJ,

> the claimant reports living independently in an apartment and attending church and Bible studies. His testimony regarding limitations due to gout are not supported by treatment records. He testified he takes no pain medications. He was functional enough to work at substantial gainful activity level for months just prior to his alleged onset date. He did not leave his last work because of impairments, but rather, was fired. He was working even while using cocaine daily.
>     . . . . Overall, when the claimant's allegations are considered in light of the objective medical evidence and the above noted factors, they do not

15

reflect an individual who is so impaired as to be incapable of engaging in any substantial gainful work activity.

(Tr. at 60.) Also, the ALJ noted that "records from September 2010 confirm ongoing cocaine use (Exhibit B18F)." (Tr. at 60.)

As stated above, a lack of support in the medical records is not enough for rejection of a claimant's testimony. Symptoms may suggest a greater severity of impairment than can be shown by objective medical evidence alone. SSR 96-7p. The ALJ referenced SSR 96-7p only in conclusory fashion. He did not discuss Pinson's need to rest after doing laundry or to take breaks while washing dishes or the location, duration, frequency, and intensity of pain such as that in Pinson's feet due to his gout. He did not discuss the side effects of Pinson's medication when he takes it (somnolence and fatigue according to Dr. Scerpella (Tr. at 510)) and the effects on Pinson when he cannot take his medications because he cannot afford them.[6] Moreover, the ALJ failed to discuss how the medical records regarding the termination of a stress test due to fatigue and shortness of breath supported Pinson's credibility. (*See* Tr. at 484.)

Further, the ALJ commented regarding "ongoing cocaine use" as of September 2010, which, if true, would contradict Pinson's testimony that he quit using illicit drugs in July 2009. But this statement is not correct. Exhibit B18F, which consists of September 2010 notes prepared at the Guest House of Milwaukee, references Pinson's previous overnight hospitalizations for drug use (Tr. at 490, 493), not cocaine use continuing to September 2010. Notably, the record contains several contrary references as to whether

---

[6]The record is replete with references to Pinson's homelessness or residence in a shelter and his inability to pay for medication. (Tr. at 283, 299, 402, 403, 410, 497, 489, 504, 507, 517.) The Commissioner admits that the ALJ considered Pinson's noncompliance without considering the reasons why Pinson was noncompliant. (Doc. 18 at 11.)

16

Pinson quit using cocaine in July 2009. (*See, e.g.*, Tr. at 537.) Thus, the case must be remanded for proper consideration of Pinson's credibility.

D.  RFC

The Seventh Circuit instructs ALJs to acknowledge the differences between the activities of daily living and the activities of a full-time job:

> The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as she [or he] would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.

*Bjornson*, 671 F.3d at 647. Here, the ALJ did not address sufficiently how Pinson's periodic activities such as doing laundry, shopping, or cleaning translated into being able to hold down a full-time job. He did not address Pinson's need to take a break after bringing laundry upstairs and failed to form a logical bridge between activities such as going to church and Bible studies once a week and working a full workweek. Thus, Pinson's activities of daily living must be considered when the ALJ determines RFC on remand.

Several additional observations deserve comment. First, the ALJ drew at least one inference that is unsupported by the record. He infers from the fact that Pinson was fired that Pinson did not leave his last position because of his impairments. However, there is no evidence in the record that supports any finding regarding the cause of Pinson's firing. Pinson testified that the employer never told him clearly why he was fired. Secondly, nowhere in the ALJ's decision did he discuss Pinson's memory issues or hand tremor,

17

though both problems are supported by evidence in the record. (*See* Tr. at 437, 487, 490, 498, 504, 537 (memory issues), 34, 194, 223, 542 (tremor).)

CONCLUSION

For the above reasons,

IT IS ORDERED that the decision of the Commissioner is reversed and this case is remanded pursuant to sentence four of 42 U.S.C. § 405(g).

Dated at Milwaukee, Wisconsin, this 29th day of August, 2013.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE